IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable Michael E. Romero

| | |
|---|---|
| In re: ) | |
| ) | Case No. 09-17437 MER |
| CCI FUNDING I, LLC, ) | Chapter 11 |
| ) | |
| Debtor. ) | |
| ) | |
| JANICE STEINLE, CHAPTER 11 ) | Adversary No. 09-1530 MER |
| TRUSTEE FOR CCI FUNDING I, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| FALL RIVER VILLAGE COMMUNITIES, ) | |
| LLC #2, NOEL WEST LANE III, and THE ) | |
| LANE III GROUP, INC., ) | Signed/Docketed |
| ) | July 30, 2012 |
| Defendants. ) | |

**ORDER**

THIS MATTER comes before the Court on the following:

- *Motion for Court Evaluation of Applicability of Stern v. Marshall, 131 S.Ct. 2594 (2011)* (Docket No. 117) filed by Defendants Fall River Communities, LLC #2, Noel West Lane III, and The Lane III Group, Inc. ("*Stern* Motion"); and

- *CCIF's Response to Defendants' Motion for Court Evaluation of Stern v. Marshall* (Docket No. 125) filed by Plaintiff CCI Funding I, LLC through Janice A. Steinle, Chapter 11 trustee for CCIF ("Response").

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(B)[1] because it seeks disallowance of claims against the estate.

## UNDISPUTED BACKGROUND FACTS[2]

On April 22, 2009, Commercial Capital, Inc. ("CCI") filed for relief under Chapter 11 of the Bankruptcy Code.  Two days later, on April 24, 2009, CCI Funding I, LLC ("CCIF") filed for relief under the same Chapter 11.  On April 30, 2009, the Court entered an Order Authorizing Joint Administration of the CCI and CCIF cases.[3]  Prior to filing for relief, CCI and CCIF were in the commercial real estate lending and loan servicing business.

### A. The Fall River Project

The instant adversary proceeding involves a dispute over funding under certain loan documents in connection with real property located in Larimer County with a common address known as 511 West Elkhorn Avenue, Estes Park, Colorado 80517 (the "Fall River Project").  The Fall River Project consists of a i) condominium community containing a total of sixty-four units[4] located in eight buildings, and ii) seven single family estate lots located just north and behind the condominium development.  The Fall River Project includes a manager's unit, a heated outdoor pool, two hot tubs, an exercise room and a community room.  The Fall River Project does not have a restaurant or a spa facility.

The Fall River Project was originally a seventy-two unit mobile home park that Robert A. Filbey, the father-in-law of Defendant Noel West Lane III ("Lane"), purchased in 1978 and subsequently placed into the Robert A. Filbey Irrevocable Trust (the "Filbey Trust") in 1990.  The beneficiaries of the Filbey Trust are Lane's wife, Rhonda L. Lane ("Rhonda"), and Robert A. Filbey's son.

---

[1]  Unless otherwise noted, all future statutory references in the text are to Title 28 of the United States Code.

[2]  The background facts provided in this Order are based upon the undisputed facts as set forth in parties' Stipulation Concerning Certain Undisputed and Disputed Facts (Docket No. 143) filed July 20, 2012.  The facts in Section D regarding Defendants' proofs of claim are based upon the Court's review of the claims filed in the CCIF and CCI bankruptcy cases.

[3]  CCIF, Chapter 11 Case No. 09-17437-MER, Docket No. 21.  On October 30, 2009, this Order was vacated and trustees appointed in each of these cases.  *Id.* at Docket No 69.

[4]  According to the parties, four condominium units were sold in May, 2008, prior to CCI's involvement with the Fall River Project.

Defendant The Lane III Group, Inc. (the "Lane III Group") is a Colorado Sub-S corporation which was formed by Lane in or about 1994. The Lane III Group describes itself as a management consulting firm. Lane is the president of Lane III Group.

In or about May 2004, the Lane III Group and the Filbey Trust formed Fall River Village Communities, LLC ("FRVC") to develop the Fall River Project. The two members of FRVC are the Lane III Group and the Filbey Trust. The Lane III Group is the managing member of FRVC.

Defendant Fall River Village Communities, LLC #2 ("Fall River II" and, collectively with Lane and the Lane III Group, the "Defendants") is a Colorado limited liability company, whose members are the Lane III Group and the Filbey Trust. Fall River II was formed on April 17, 2008, for the sole purpose of acquiring the Fall River Project from FRVC, and developing, constructing and selling that property. The Lane III Group is the managing member of Fall River II.

In or about February 2005, FRVC, as borrower, obtained two construction and development loans from WestStar Bank ("WestStar"), to finance the construction of the Fall River Project. In the aggregate, these loans totaled not less than $6,784,000 (the "WestStar Loans"). In late 2006, WestStar was merged into U.S. Bank National Association ("U.S. Bank"). The WestStar Loans were amended and supplemented by two loan modification agreements with U.S. Bank dated March 6, 2007 (the "Modification Agreements"). On March 6, 2007, U.S. Bank also made a new construction loan to FRVC in the amount of $2.51 million (the "New U.S. Bank Loan," and together with the West Star Loans as modified by the Modification Agreements and any documents related thereto, the "U.S. Bank Loans"). The maturity date on the U.S. Bank Loans was May 1, 2007 (the "U.S. Bank Loan Maturity Date"). FRVC's obligations under the U.S. Bank Loans were guaranteed by Lane, Rhonda, the Lane III Group and the Filbey Trust in favor of U.S. Bank.

**B.     FRVC's Chapter 11 Bankruptcy Case**

U.S. Bank and FRVC agreed from time to time to extend the U.S. Bank Loans to afford FRVC time to obtain a replacement lender for U.S. Bank. FRVC failed to repay the U.S. Bank Loans on the U.S. Bank Loan Maturity Date. On or around May 1, 2007, FRVC and U.S. Bank began discussions to extend the U.S. Bank Loan Maturity Date. On May 29, 2007, U.S. Bank sent FRVC three notices of default, reserving U.S. Bank's right to exercise any right or remedy available to it, including foreclosure of the Fall River Project, if payment in full of the indebtedness under the U.S. Bank Loans was not received on or before June 11, 2007.

On June 7, 2007, FRVC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the U.S. Bankruptcy Court for the District of Colorado in the case styled *In re Fall River Village Communities LLC*, Case No. 07-15993-HRT (the "FRVC Bankruptcy Case"). FRVC was a single asset real estate business as defined in

11 U.S.C. § 101(51B). On September 6, 2007, U.S. Bank filed a motion seeking relief from the automatic stay in order to exercise its remedies under the U.S. Bank Loans, which motion was granted on October 9, 2007.

On January 29, 2008, U.S. Bank and FRVC filed in the FRVC Bankruptcy Case a *Joint Motion to Approve Settlement Agreement and For Authority to Transfer Property Free and Clear of Liens, Claims and Interests Pursuant to 11 U.S.C. § 363(f)* (the "First Settlement Motion"), requesting approval of the initial U.S. Bank/FRVC settlement agreement. The initial settlement agreement provided FRVC would pay U.S. Bank a discounted payoff amount of $5,830,000 (the "Original U.S. Bank Payoff") no later than March 21, 2008 (the "Payoff Date"). As set forth in the initial settlement agreement, if FRVC did not pay the Original U.S. Bank Payoff by the Payoff Date, all of FRVC's assets would be transferred to U.S. Bank's designee. In the First Settlement Motion, FRVC admitted the following: 1) U.S. Bank was a secured creditor, with valid and perfected liens and security interests in all of FRVC's assets; 2) FRVC owed U.S. Bank at least $6,983,432.35, plus accrued interest, costs and attorneys' fees; and 3) U.S. Bank was entitled to foreclose and repossess the collateral immediately. The First Settlement Motion was approved on February 25, 2008.

FRVC did not deliver the Original U.S. Bank Payoff by the Payoff Date. On April 2, 2008, FRVC and U.S. Bank filed a motion requesting to extend the date of the settlement from March 21, 2008 to April 21, 2008 (the "Extension Motion") to accommodate a loan letter from CCI dated March 20, 2008, and CCI's ongoing negotiations with U.S. Bank. On May 1, 2008, the bankruptcy court granted the Extension Motion in the FRVC bankruptcy case.[5]

**C.   Fall River II's Financing from CCI**

*1.   The CCI/Fall River II Loan Documents*

CCI made loans to Fall River II in the total face amount of $13,235,358.73 (the "CCI/Fall River II Loans") pursuant to five separate promissory notes (each, a "Promissory Note" and collectively, the "Promissory Notes"), and five separate construction loan agreements (each, a "Construction Loan Agreement" and collectively, the "Construction Loan Agreements"), executed by Lane, as president of the Lane III Group, on behalf of Fall River II. The Promissory Notes were each dated May 19, 2008, in the respective principal face amounts of $1,571,902 ("Loan 47"), $2,684,294.17 ("Loan 52"), $2,905,178.96 ("Loan 53"), $3,016,487.28 ("Loan 54") and $3,057,495.61

---

[5] The parties included information regarding a second settlement motion filed jointly by U.S. Bank and FRVC on May 23, 2008 in the FRVC bankruptcy case as a "disputed" fact. *See Stipulation Concerning Certain Undisputed and Disputed Facts* (Docket No. 143), at ¶ 27. Without further evidence and for the purposes of this order evaluating *Stern*, the Court must assume, under the second settlement agreement approved in the FRVC bankruptcy, the transfer of ownership of the Fall River Project from FRVC to Fall River II.

("Loan 55"). Each Promissory Note provided the principal balance outstanding would bear interest at the one-month LIBOR rate plus 9.17%, but not less than 12%, and all amounts outstanding under each Promissory Note would be due and payable on May 19, 2009 (the "CCI Maturity Date"). Pursuant to Section 3.1 of the Construction Loan Agreements, the aggregate sum of all outstanding amounts advanced to Fall River II at any given point in time was not to exceed $10 Million.

Each of the CCI/Fall River II Loans was secured by two separate Deeds of Trust executed by Lane on behalf of Fall River II, as Grantor, to the Public Trustee of Larimer County, Colorado, as Trustee, for the benefit of CCI, as Lender (collectively, the "Deeds of Trust"). The Deeds of Trust cover a portion of the Fall River Property, including lots 1-8, outlots A and B, condominium units 180, 184, 185, 186, 187, and 188, and Buildings 1-8. Lane unconditionally guaranteed the prompt payment of all monies owed by Fall River II on each of the CCI/Fall River II Loans, pursuant to the five Unconditional Guaranty of Payment agreements dated May 19, 2008, executed by Lane as Guarantor (collectively, the "Lane Guaranties"). In addition, the Lane III Group unconditionally guaranteed the prompt payment of all monies owed by Fall River II on each of the CCI/Fall River II Loans, pursuant to the five Unconditional Guaranty of Payment agreements dated as of May 19, 2008, executed by Lane on behalf of the Lane III Group, as Guarantor (collectively, the "Lane III Group Guaranties" and collectively with the Lane Guaranties, the "Guaranties").

As additional security for the CCI/Fall River II Loans, Fall River II unconditionally assigned to CCI, among other things, all rents, profits, and income generated from the Fall River Project pursuant to the five separate Present Assignments of Rents and Leases executed by Lane. On May 30, 2008, a UCC financing statement covering Fall River II's personal property was filed with the Colorado Secretary of State in connection with the CCI/Fall River II Loans at Reception No. 2008F055380. On June 4, 2008, a UCC financing statement covering Fall River II's personal property was recorded in Larimer County for the CCI/Fall River II Loans at Reception No. 20080035530.

On or about April 30, 2008, Fall River II received a letter from CCI disclosing its use of outside credit facilities to fund its loans, and that payments on account of the loans were to be made to an account in the name of CCIF. Lane, as president of the Lane III Group, countersigned the letter on May 21, 2008, acknowledging he was aware of its terms.

On or about July 24, 2008, CCI sent five letters to Fall River II. Each of the letters stated as follows, with the only difference being the amount of the loan referenced in the letter:

> Your Promissory Note in the amount of [____] matures on May 19, 2009. Please note that this loan does not allow for an extension and is expected to be paid in full at maturity. We have just been given notice by our credit facilities that extension exception requests will most likely not be granted in

this market environment given the current sub-prime secondary market liquidity crunch. Please make sure that all necessary arrangements have been made so that this loan will be paid in full when due.

### 2. *Funding of the CCI/Fall River II Loans by CCI*

Although the parties admit CCI provided the initial funding to Fall River II under the terms of the Promissory Notes and Construction Loan Agreements, the parties dispute the amount of the initial funding versus draw requests, and the purpose and use of the funds. The parties also dispute whether CCI sold the CCI/Fall River II Loans to CCIF, and the intent of the remaining obligations between the parties under the loan documents. The few stipulated facts provided by the parties with respect to the funding issues are as follows:

1) U.S. Bank and FRVC entered into a modified settlement agreement, which was approved by the bankruptcy court in the FRVC bankruptcy case on May 30, 2008.

2) Under the terms of the modified settlement agreement, Fall River II (or FRVC through Fall River, II) used the initial proceeds of the CCI/Fall River II Loans to make a reduced payoff to U.S. Bank and an additional payment to other creditors related to the Fall River Project.

3) Aside from the initial funding, Fall River II submitted regular draw requests to CCI for further funding from May 2008 through February 2009.

4) In mid-March 2009, CCI transferred the sum of $16,870.25 to Indy Mac, the holder of the first mortgage on certain real property known by street address as 5301 S. University, Greenwood Village, Colorado, and allocated that transfer across three of the five loans.

5) A total of $5,218,994.48 was advanced by CCI to or on behalf of Fall River II.

The disputes between the parties therefore relate to one set of core documents which were executed to effect the funding for the development of the Fall River Project, namely, the Promissory Notes, the Construction Loan Agreements, the Deeds of Trust and the Proofs of Claim filed in connection with these documents.

**D.    Defendants' Proofs of Claim**

Upon review of the claims filed in both the CCIF and CCI bankruptcy cases, as relevant to this adversary proceeding, the Court finds the Defendants filed the following proofs of claim:

1) Fall River II claims against CCIF:
     Proof of Claim No. 3-1 in the amount of $20,450,000.00;
     Proof of Claim No. 21-1 in the amount of $5,344,000.00;
     Proof of Claim No. 22-1 in the amount of $20,450,000.00;
     Proof of Claim No. 26-1 in the amount of $5,344,000.00.

2) Fall River II claims against CCI:
     Proof of Claim No. 4-1 in the amount of $22,122,420.25;
     Proof of Claim No. 5-1 in the amount of $20,450,000.00;
     Proof of Claim No. 149-1 in the amount of $20,450,000.00.

3) Lane claims against CCIF:
     Proof of Claim No. 4-1 in the amount of $2,503,125.00;
     Proof of Claim No. 23-1 in the amount of $2,503,125.00.

4) Lane claims against CCI:
     Proof of Claim No. 8-1 in the amount of $2,503,125.00;
     Proof of Claim No. 153-1 in the amount of $2,503,125.00.

5) Lane III Group claim against CCIF:
     Proof of Claim No. 27-1 in the amount of $3,067,695.00.

6) Lane III Group claim against CCI:
     Proof of Claim No. 148-1 in the amount of $3,067,695.00.

(collectively, the "Proofs of Claim").[6]

## PROCEDURAL HISTORY

On September 1, 2009, CCIF filed the above-captioned adversary proceeding against Fall River II. The *Complaint for Declaration of Validity and Extent of Assets of the Estate*[7] ("Complaint") alleges CCIF's affiliated entity, CCI, made the five CCI/Fall River II Loans to Fall River II in the aggregate original principal amount of $13,235,358.73 with each loan evidenced by the Promissory Notes and secured by the Deeds of Trust against the Fall River Project. The Complaint also alleges Lane, the principal of Fall River II, indicated Fall River II intends to contest the validity of the liens

---

[6] The Court notes FRVC filed three claims against CCIF (Proof of Claim No. 1-1 in the amount of $22,122,420.25; Proof of Claim No. 2-1 in the amount of $20,450,000.00; and Proof of Claim No. 29-1 in the amount of $28,896,768.37) and FRVC filed four claims against CCI (Proof of Claim No. 6-1 in the amount of $20,450,000.00; Proof of Claim No. 7-1 in the amount of $20,450,000.00; Proof of Claim No. 150-1 in the amount of $20,450,000.00; and Proof of Claim No. 154-1 in the amount of $5,344,000.00).

[7] Docket No. 2.

created by the Deeds of Trust. According to the Complaint, Fall River II, Lane and other affiliates of Lane filed multiple proofs of claim against the CCIF and CCI estates, asserting secured and unsecured debts in the aggregate amount of approximately $150 Million.

On November 1, 2009 Fall River II filed its Answer to the Complaint,[8] arguing CCI never sold the CCI/Fall River II Loans to CCIF. Further, Fall River II alleged the elements of the Complaint are substantially the same as the dispute between the parties pending before the Larimer County District Court, which was stayed by the filing of the underlying bankruptcy cases.[9]

On November 10, 2009, in the underlying CCIF bankruptcy case, the Court entered an *Order Approving the United States Trustee's Appointment of Chapter 11 Trustee for CCIF*, appointing Janice Steinle ("Steinle") as Chapter 11 trustee for CCIF.[10] On December 21, 2009, Steinle filed an *Unopposed Motion for Sixty Day Stay of Proceedings*,[11] seeking time to resolve the matter. The Court granted the Motion on the same date.[12] On February 23, 2010, Steinle filed a status report indicating the parties were unable to resolve the matter and the Chapter 11 trustee of CCI, James T. Markus ("Markus"), intended to file a motion to intervene.[13] The parties also requested the case management deadlines be held in abeyance pending resolution of CCI's motion to intervene, and the Court entered an order granting this request on February 26, 2010.[14]

On May 17, 2010, Steinle filed a *Motion to Amend Complaint and Join Additional Defendants* ("Motion to Amend Complaint"),[15] stating Steinle and Markus disputed the ownership of certain loans between the CCIF and CCI estates, including the CCI/Fall River II Loans. The trustees agreed Steinle would be authorized to take enforcement actions against most of the mortgage loans, including the CCI/Fall River II Loans. However, several of the borrowers, including Fall River II, objected to Steinle

---

[8] Docket No. 8.

[9] Fall River II also alleged it filed a motion for relief from stay seeking to proceed in state court. However, upon review of the docket in the underlying bankruptcy cases, the Court notes that no such motion was ever filed by Fall River II.

[10] Chapter 11 Case No. 09-17238 MER, Docket No. 83.

[11] Docket No. 11.

[12] Docket No. 13.

[13] *See* Docket No. 16.

[14] Docket No. 17.

[15] Docket No. 20.

proceeding in state court to enforce the deeds of trust, and on February 10, 2010, the Court denied the motions to approve enforcement action with respect to those borrowers.  Accordingly, Steinle asked Markus to join her as a co-plaintiff in this adversary proceeding against Fall River II, but Markus declined.  Thereafter, Steinle filed the Motion to Amend Complaint, seeking to amend the Complaint to join Markus in his capacity as the CCI trustee as a defendant, and to join Lane and the Lane III Group as defendants, to obtain complete relief as to the extent, priority, and validity of the liens claimed by CCIF against the Fall River Project.

On May 26, 2010, Fall River II filed both an *Objection to the Motion to Amend Complaint*[16] and a *Motion to Dismiss the Adversary Proceeding*.[17]  At the hearing held June 7, 2010, the Court denied the Motion to Dismiss without prejudice, and granted the Motion to Amend.[18]  On June 9, 2010, Steinle filed the Amended Complaint,[19] and subsequently filed a Corrected Amended Complaint[20] on June 24, 2010.

On July 26, 2010, the CCI estate, through Markus, filed an answer to the Corrected Amended Complaint.[21]  On the same date, Fall River II filed its Motion to Dismiss Corrected Amended Complaint[22] and Steinle filed a response thereto.  At the hearing held November 4, 2010, the Court denied Fall River II's Motion to Dismiss the Corrected Amended Complaint without prejudice, and ordered the Defendants to file an answer to the Corrected Amended Complaint.[23]  The Defendants filed their Answer to the Corrected Amended Complaint on November 29, 2010.[24]

Following several status conferences, WestLB AG, New York Branch ("WestLB") filed a Motion to Intervene on June 29, 2011, seeking to intervene to assert claims and

---

[16] Docket No. 21.

[17] Docket No. 22.

[18] Docket No. 27.

[19] Docket No. 29.

[20] Docket No. 35.

[21] Docket No. 39.

[22] Docket No. 38.

[23] Docket No. 54.

[24] Docket No. 53.

protects its interests.[25] The Defendants filed a *Response to WestLB's Motion to Intervene*,[26] seeking an order denying the Motion to Intervene and in the alternative if the Motion to Intervene was granted, seeking an extension of all pending deadlines in the case. The matter was set for a hearing, however, six days prior to the scheduled hearing West LB withdrew its Motion to Intervene.[27]

On July 12, 2011, this Court entered its Amended Judgment in *Steinle et al. v. Markus*, Adversary No. 09-1739-MER. The Amended Judgment determined, *inter alia*, certain promissory notes, deeds of trust, mortgages, guarantees, all other documents and property interests related thereto, and any and all proceeds thereof, "are the property of the bankruptcy estate of [CCIF], free and clear of any claims and interests of the bankruptcy estate of [CCI]."[28] The loans specifically listed in the Amended Judgment as being owned by the CCIF bankruptcy estate, free and clear of any claims or interests of the CCI bankruptcy estate, included each of the CCI/Fall River II Loans. After entry of the Amended Judgment, Steinle executed the following documents:

1) Allonge to Promissory Note, assigning from CCI to CCIF the Promissory Note evidencing CCI Loan 47 to Fall River II;

2) Allonge to Promissory Note, assigning from CCI to CCIF the Promissory Note evidencing CCI Loan 52 to Fall River II;

3) Allonge to Promissory Note, assigning from CCI to CCIF the Promissory Note evidencing CCI Loan 53 to Fall River II;

4) Allonge to Promissory Note, assigning from CCI to CCIF the Promissory Note evidencing CCI Loan 54 to Fall River II;

5) Allonge to Promissory Note, assigning from CCI to CCIF the Promissory Note evidencing CCI Loan 55 to Fall River II;

6) Assignment of Deeds of Trust and Other Loan Documents (recorded on October 28, 2011 at Reception No. 20110065860), assigning from CCI to

---

[25] Docket No. 75. On December 7, 2011, in the underlying CCIF bankruptcy case, this Court confirmed the *Fourth Amended Plan of Liquidation Under Chapter 11 Filed by WestLB, New York Branch*. *See* Chapter 11 Case No. 09-17238 MER, Docket No. 956. Steinle is the Responsible Officer of CCIF pursuant to the confirmed plan.

[26] Docket No. 82.

[27] Docket No. 87.

[28] *See* Amended Judgment, Adversary Proceeding No. 09-1739-MER, Docket No. 146.

               CCIF the Deeds of Trust and all other loan documents evidencing and securing CCI Loan 47 to Fall River II;

7)     Assignment of Deeds of Trust and Other Loan Documents (recorded on October 28, 2011 at Reception No. 20110065861), assigning from CCI to CCIF the Deeds of Trust and all other loan documents evidencing and securing CCI Loan 52 to Fall River II;

8)     Assignment of Deeds of Trust and Other Loan Documents (recorded on October 28, 2011 at Reception No. 20110065862), assigning from CCI to CCIF the Deeds of Trust and all other loan documents evidencing and securing CCI Loan 53 to Fall River II;

9)     Assignment of Deeds of Trust and Other Loan Documents (recorded on October 28, 2011 at Reception No. 20110065863), assigning from CCI to CCIF the Deeds of Trust and all other loan documents evidencing and securing CCI Loan 54 to Fall River II; and

10)    Assignment of Deeds of Trust and Other Loan Documents (recorded on October 28, 2011 at Reception No. 20110065864), assigning from CCI to CCIF the Deeds of Trust and all other loan documents evidencing and securing CCI Loan 55 to Fall River II.[29]

In the interim, on July 1, 2011, Steinle filed a *Motion for Leave to Amend Adversary Complaint*[30] and the *Second Amended Complaint*.[31] The Motion for Leave advised the Court the issues between Steinle and Markus had been resolved and settled, and sought leave to file a second amended complaint with claims against the Defendants only. The Defendants did not file a response, and the Court granted the Motion for Leave to Amend on July 25, 2011.[32] The Second Amended Complaint alleges the Defendants filed their Proofs of Claim against the CCIF and CCI estates, the CCIF estate holds the Promissory Notes, and Lane and the Lane III Group guaranteed the Promissory Notes. The Second Amended Complaint asserts three claims for relief: 1) judgment against Fall River II on the Promissory Notes in the principal amount of $12,160,046.71 plus accrued interest, late charges, fees and costs; 2) disallowance of

---

[29] The parties stipulated each of these documents were executed, however, the Defendants dispute the date Steinle executed the documents. Stipulation Concerning Certain Undisputed and Disputed Facts, Docket No. 143, at p.14-15, ¶ 51. For the purposes of this Order, the date these documents were executed is immaterial.

[30] Docket No. 78.

[31] Docket No. 77.

[32] Docket No. 80.

the Defendants' Proofs of Claim; and 3) judgment against Lane and the Lane III Group on the Guaranties.[33]

On August 9, 2011, the Defendants filed their *Answer to the Second Amended Complaint*.[34] The Defendants deny any liability, and assert over seven pages of combined affirmative defenses, allegations and counterclaims, including that CCI was conducting a Ponzi scheme with West LB, CCI misled investors and borrowers, and CCI, CCIF and West LB engaged in fraud.[35]

The Court held a trial scheduling conference on December 21, 2011, and set the trial in this matter for August 7, 2012.[36] At the first pre-trial conference held June 4, 2012, the Court ordered the parties to file by June 14, 2012 "a motion requesting the Court evaluate whether or not the dictates of *Stern v. Marshall*, ___U.S.___, 131 S.Ct. 2594 (2011), apply to this adversary proceeding. Failure to file such a motion by the deadline will constitute express consent to this Court hearing all issues in this matter."[37] On June 14, 2012, the Defendants timely filed their *Stern* Motion, and Steinle filed her Response on June 22, 2012.

## DISCUSSION

The central dispute in this adversary proceeding concerns the claims among the parties under the Promissory Notes, the Deeds of Trust and the Construction Loan Documents. The Defendants filed the Proofs of Claim in connection with these documents. Steinle alleges Defendants owe money to the CCIF estate under these documents, and seeks to disallow Defendants' claims. Defendants allege CCIF did not provide funding under the same documents and are entitled to claims against the CCIF estate. The claims at issue are inextricably tied to these documents, and any determination on the allowance or disallowance of Defendants' claims cannot exist independently from a determination of liability under those writings.

The Defendants requested the Court evaluate the applicability of *Stern* with respect to Steinle's First Claim for Relief, which seeks a judgment against Fall River II and a determination of the indebtedness owed in connection with the five Promissory

---

[33] *See* Docket No. 77.

[34] Docket No. 90.

[35] Approximately one month later, Jay Freeman, as co-counsel for Fall River II and Lane, filed a *Motion to Withdraw as Counsel and Notice to Client* (Docket No. 91). On October 21, 2011, the Court granted Jay Freeman's Motion to Withdraw as Counsel for Fall River II and Lane (Docket No. 101).

[36] Docket No. 104.

[37] Docket No. 113.

Notes.[38] The Defendants contend this Court may not hear Steinle's First Claim for Relief, and provide three arguments in support of their assertion.

First, the Defendants' *Stern* Motion asserts this Court does not have constitutional authority to determine the First Claim for Relief under the dictates of *Stern*,[39] and seeks entry of an order permitting the parties to litigate the First Claim for Relief in state court. The Defendants assert the First Claim for Relief is "a breach of contract case which could be independently brought by [Steinle] against Defendants as a Colorado state court proceeding"[40] and the resolution of the Second Claim for Relief for disallowance of the proofs of claim "will not resolve the promissory note issues raised by the First Claim for Relief."[41]

Second, the Defendants argue the lack of constitutional authority prevents this Court from entering findings of fact and conclusions of law. Specifically, they state since the First Claim for Relief is a "core" proceeding under 28 U.S.C. § 157, this Court may not even issue recommended findings and conclusions, as it could do in a "non-core" "related-to" proceeding under § 157(c)(1). Rather, according to the Defendants, this Court lacks any authority over the First Claim for Relief. Relying on a single post-*Stern* case addressing recovery of fraudulent transfers, *In re Blixseth*,[42] the Defendants conclude the First Claim for Relief "is clearly a core claim that could be heard and decided by this Court but for the lack of constitutional authority raised in *Stern*. The core nature of the First Claim for Relief precludes the parties and this Court from treating the claim as a non-core matter."[43]

---

[38] *See* Docket No. 77, at p. 4-5. The First Claim for Relief seeks judgment on the Promissory Notes. By necessity, the Court will also address the issues raised in the *Stern* Motion for the Third Claim for Relief regarding the Guaranties because the Guaranties involve the same set of facts and the same operative documents.

[39] *Stern v. Marshall*, ___U.S.___, 131 S.Ct. 2594, 180 L. Ed. 2d 475 (2011) *reh'g denied,* 132 S. Ct. 56, 180 L. Ed. 2d 924 (2011).

[40] Docket No. 117, at p. 3, ¶ 13.

[41] *Id.* at p. 4, ¶ 14.

[42] *In re Blixseth*, 2011 WL 3274042 (Bankr. D. Mont. 2011) (slip copy). The Court notes the U.S. Bankruptcy Court for the District of Montana subsequently modified its order, stating its earlier decision interpreting *Stern* as depriving a bankruptcy court of subject matter jurisdiction to hear a fraudulent transfer claim was "flawed." *See In re Blixseth*, 463 B.R. 896, 907 (Bankr. D. Mont. 2012).

[43] Docket No. 117, at p. 5, ¶ 19.

Finally, the Defendants, again assuming the Court lacks constitutional authority, argue as a court of limited jurisdiction "this Court may not hear and decide [Steinle's] First Claim for Relief because doing so exceeds its subject-matter jurisdiction."[44]

In her Response, Steinle argues *Stern* does not prevent this Court from hearing the First Claim for Relief because resolution of the First Claim for Relief is necessary as part of the claims allowance process.[45] Relying on the *Mercury Companies*[46] decision, Steinle asserts the Defendants have already consented irrevocably to this Court's ability to enter a final judgment on the First Claim for Relief.[47] Specifically, Steinle notes the Defendants previously consented to both the jurisdiction of the Court and the constitutional authority of this Court.[48] In the alternative, Steinle contends even if the Court may not enter final judgment on the First Claim for Relief, the Court should submit proposed findings of fact and conclusions of law to the state court.[49]

## A. *Stern v. Marshall*[50]

In *Stern*, Vickie Marshall ("Vickie") was married to J. Howard Marshall, II ("Howard"). Vickie expected to receive an inheritance from this relationship; Howard did not include Vickie in his will. Rather, Howard's son, E. Pierce Marshall ("Pierce") was designated as the beneficiary of Howard's estate. Before Howard passed away, Vickie filed suit in Texas state probate court, asserting Pierce fraudulently induced Howard to sign a living trust that did not include her. Pierce denied any fraudulent activity and defended the validity of Howard's trust and will. After Howard's passing, Vickie did not receive her desired inheritance, and subsequently filed for bankruptcy protection.

In Vickie's bankruptcy case, Pierce initiated an adversary proceeding against Vickie alleging Vickie had defamed him, and seeking a finding his defamation claim was nondischargeable. Pierce also filed a proof of claim in the underlying bankruptcy case to

---

[44] *Id.* at p. 6, ¶ 25.

[45] *See* Docket No. 125, at p. 3-4.

[46] *Mercury Companies, Inc. v. FNF Sec. Acquisition, Inc.*, 460 B.R. 778, 781 (D. Colo. 2011). In *Mercury Companies*, the district court denied the motion to withdraw the reference finding the parties had consented to the bankruptcy court entering final orders by admitting in their initial pleadings that the proceeding was core. *Id.* at 782.

[47] Docket No. 125, at p. 4-6.

[48] *See id.* at p. 4-7.

[49] *See id.* at p. 7-8. Because the Court determines it has the authority to determine the First Claim for Relief, the Court will not reach Steinle's alternative argument.

[50] *Stern v. Marshall*, ___U.S.___, 131 S.Ct. 2594, 180 L. Ed. 2d 475 (2011) *reh'g denied,* 132 S. Ct. 56, 180 L. Ed. 2d 924 (2011).

recover damages for his defamation claim. Vickie responded to Pierce's initial complaint by asserting truth as a defense to the alleged defamation and by filing a counterclaim for tortious interference with the gift she expected from Howard.[51]

Based upon the facts before it, the U.S. Supreme Court held § 157(b)(2)(C) granted bankruptcy courts the statutory authority to render final judgments on the core matter of a debtor's counterclaims against a claimant; however, bankruptcy courts "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."[52]  The Supreme Court recognized the limitation of this holding, clearly stating "Congress, in one isolated respect, exceeded [the] limitation in the Bankruptcy Act of 1984" to enter final orders,[53] and found a "narrow" exception to the constitutional authority of bankruptcy courts under § 157(b)(2)(C), a provision governing counterclaims by the estate against claimants.[54]

The Supreme Court propounded the following two-pronged test to determine whether a bankruptcy court has constitutional authority to adjudicate an action:

> *Granfinanciera's* distinction between actions that seek 'to augment the bankruptcy estate' and those that seek 'a *pro rata* share of the bankruptcy *res*,' *ibid.*, reaffirms that Congress may not bypass Article III simply because a proceeding may have some bearing on a bankruptcy case; **the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process**.[55]

In other words, despite Congress' express designation of "counterclaims by the estate against persons filing claims against the estate"[56] as core proceedings, bankruptcy courts lack constitutional authority to render final decisions in cases where resolution of a **debtor's independent state law counterclaim** does not stem from the bankruptcy itself or is not necessary to resolve the allowance or disallowance of a claim against the

---

[51]  *Id.* at 2611.  Although not provided here, for an extensive summary of the procedural posture of the *Stern* matter, *see In re USDigital, Inc.*, 461 B.R. 276, 280-81 (Bankr. D. Del. 2011).

[52]  *Id.* at 2620.

[53]  *Id.*

[54]  *Id.*

[55]  *See id.* at 2618 (emphasis added).  Under *Stern*, bankruptcy courts may decide cases seeking a *pro rata* share of the bankruptcy *res*, but not cases seeking to augment the estate.

[56]  § 157(b)(2)(C).

estate.[57]  If either prong of the test is satisfied *(i.e.* the action either stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process), the bankruptcy court has constitutional authority to enter a final order.  If neither prong is satisfied, the bankruptcy court lacks such authority to enter final judgment and may only submit proposed findings of fact and conclusions of law to the district court.[58]

**B.   This Court has Constitutional Authority to Determine the First Claim for Relief.**

The *Stern* decision is a focused holding that "does not change all that much" and should be considered in such context.[59]  Expansion of the narrow holding of *Stern* to a separate core matter under § 157(b)(2) is not warranted where the Supreme Court's plain intent was to limit the application of the holding.  This Court previously joined the wide range of courts interpreting *Stern* as a narrow opinion, and has taken the following position on constitutional authority:

> *Stern* did not make any rulings as to a bankruptcy court's subject matter jurisdiction, but dealt instead with a bankruptcy court's power to enter final, binding judgments as to a certain narrow group of state law actions. *Stern* addressed a bankruptcy court's authority to hear and make a final determination of a debtor's common-law counterclaim to a proof of claim filed against the bankruptcy estate.[60]

The *Stern* Court was concerned the literal language of § 157(b)(2)(C) was overbroad and gave bankruptcy courts core jurisdiction over all debtors' counterclaims instead of jurisdiction over only those with an integral relationship to bankruptcy matters.[61]  *Stern* thus distinguishes between claims which are integrally related to a bankruptcy estate and claims which "simply attempt[] to augment the bankruptcy estate."[62]  Claims which are integrally related to a bankruptcy estate are those which are

---

[57]  *Stern*, 131 S.Ct. at 2611 ("Here [the debtor's] claim is a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy.").

[58]  As discussed herein, *supra*, if the proceeding is "non-core" than the parties must consent for a bankruptcy court to submit findings to the district court.  Such consent is unnecessary for core proceedings by operation of § 157.

[59]  *Stern*, 131 S.Ct. at  2620.

[60]  *In re DeLaFuente*, 10-25220 MER, 2012 WL 1535848, at *3 (Bankr. D. Colo. Apr. 30, 2012) (internal citations omitted).

[61]  *See Stern*, 131 S.Ct. at 2605.

[62]  *Id.* at 2616.

"deemed essential to a limited regulatory objective."[63]  A claim which augments a bankruptcy estate is "the very type of claim we held in *Northern Pipeline* and *Granfinanciera* must be decided by an Article III court."[64]  Although the common usage of "augment" is broad enough to include claims which are integrally related to a bankruptcy estate, the Supreme Court's usage in *Stern* reflects an intent to carve out and allow claims, such as those in this adversary proceeding, which are in fact integrally related to the claims process.

In the present matter, the degree of integration between Steinle's claims and the Defendants' defenses and counterclaims form the essence of the constitutional issue before this Court.  Initially, the "core" / "non-core distinction is not relevant here.  Steinle and the Defendants admitted all claims for relief in the Second Amended Complaint are core in their respective pleadings.[65]  The Court agrees, and finds all claims asserted in this proceeding are core.

With respect to the first prong of the *Stern* test, the Court determines Steinle's Second Claim for Relief objecting to the allowance of the Proofs of Claim is clearly a matter that stems from the bankruptcy itself.[66]  By filing their Proofs of Claim in the underlying bankruptcy cases of CCI and CCIF, the Defendants triggered the process of claims allowance and disallowance.  The question remaining therefore, is whether the First Claim for Relief seeking judgment on the Promissory Notes, and by necessity the Third Claim for Relief regarding the Guaranties of the obligations under the same Promissory Notes, satisfy either prong under *Stern* confirming the constitutional authority of this Court to hear and determine those claims as being part of the claims adjudication process or are simply mechanisms for augmenting the debtor's estate.

As noted above, *Stern* strips bankruptcy courts of authority only where debtors' state law counterclaims cannot be fully resolved in the bankruptcy claims adjudication process.  The instant adversary proceeding comprises a quintessential claims adjudication.  Defendants filed Proofs of Claim, thereby constituting *prima facie* evidence of the validity and amount of the claims.  Through the Second Amended Complaint,

---

[63]  *Id.* at 2613.

[64]  *Id.* at 2616.

[65]  Docket No. 117, at p. 2, ¶ 5; Docket No. 90, at p. 3, ¶ 6-7.  The consent issue is discussed further in footnote 67, *supra*.

[66]  Such actions are "core" proceedings in which a bankruptcy court may enter a final order.  *See Langenkamp v. Culp*, 498 U.S. 42, 44, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) ("[B]y filing a claim against the bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims.' . . . If the creditor is met, in turn, with a preference action from the trustee, that action becomes part of the claims-allowance process. . . . In other words, the creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship.") (internal quotation omitted).

Steinle, in her capacity as Chapter 11 trustee for the CCIF estate, objected to the allowance of Defendants' Proofs of Claim, and asserted claims against the Defendants as borrowers and guarantors under the Promissory Notes. The Defendants set forth a plethora of allegations in their "Affirmative Defenses and Counterclaims" which reference their Proofs of Claim.[67]

As noted, the operative documents are the Promissory Notes, the Construction Loan agreements, the Deeds of Trust and the Proofs of Claim directly related to these documents. A determination of liability under these documents is inextricably linked to a determination of the allowance of the Defendants' proofs of claim based on the same documents. Steinle's claims for relief and the Defendants' Proofs of Claim all arise from the same operative facts and documents. Stated differently, a determination of liability under one set of documents to the transaction necessitates an evaluation of the allowance of claims under the same documents. Thus, the Court finds the First and Third Claims for Relief are integrally related to the bankruptcy estate, and will be fully resolved through the claims allowance process.[68]

Based on the foregoing, the Court concludes the First Claim for Relief and the Third Claim for Relief will necessarily be resolved as part of the claims allowance process, in satisfaction of the two-prong test articulated in *Stern*. Therefore, this Court has constitutional authority to hear and render a final decision on all claims for relief as alleged in the Second Amended Complaint.

**C.    This Court has Statutory Authority and Subject Matter Jurisdiction to Determine the First Claim for Relief.**

The Defendants' further argue the Court does not have subject-matter jurisdiction to hear or decide the First Claim for Relief. This argument lacks any merit, and in any event, is moot based on the Court's conclusion it has constitutional authority to hear the First and Third Claims for Relief. With respect to subject-matter jurisdiction, the *Stern* Court explained:

> Because "[b]randing a rule as going to a court's subject-matter jurisdiction alters the normal operation of our adversarial system," *Henderson v. Shinseki,* 562 U.S. ——, —— – ——, 131 S.Ct. 1197, 1201–03, 179 L.Ed.2d 159 (2011), we are not inclined to interpret statutes as creating a jurisdictional bar when they are not framed as such. See generally *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 516, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) ("when

---

[67] Docket No. 90, at p. 6-13, ¶ 42-116.

[68] The Court also notes there exists an argument that all parties have consented to this Court's adjudication of all claims raised in this case. However, in light of the enunciated ruling herein on the constitutional authority possessed by this Court to hear this dispute, the consent issue need not be addressed.

> Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character").
>
> Section 157(b)(5) does not have the hallmarks of a jurisdictional decree. To begin, the statutory text does not refer to either district court or bankruptcy court "jurisdiction," instead addressing only where personal injury tort claims "shall be tried."
>
> The statutory context also belies Pierce's jurisdictional claim. **Section 157 allocates the authority to enter final judgment between the bankruptcy court and the district court.** See §§ 157(b)(1), (c)(1). **That allocation does not implicate questions of subject matter jurisdiction.** See § 157(c)(2) (parties may consent to entry of final judgment by bankruptcy judge in non-core case).[69]

Thus, the *Stern* decision expressly states subject-matter jurisdiction is not implicated under § 157.

Section 1334 vests in district courts original and exclusive jurisdiction of all cases under Title 11.[70] District courts are also vested with original, but not exclusive, jurisdiction of all civil proceedings arising under Title 11, or arising in or related to cases under Title 11.[71] Thus, if an adversary proceeding falls within the scope of § 1334(b), the district courts have jurisdiction over the adversary proceeding.

A bankruptcy court has jurisdiction over an adversary proceeding by operation of § 157, which allows each district court to "provide that any or all cases arising under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."[72] The United States District Court for the District of Colorado has referred all proceedings arising under title 11, or arising in or related to a case under title 11, to the United States Bankruptcy Court for the District of Colorado pursuant to D.C.Colo.LCivR 84.1.

Steinle alleged "[p]ursuant to 28 U.S.C. §1334, FED. R. BANKR. P. 7001(1) and D.C.COLO.LCivR 84.1(A), this Court has jurisdiction to hear and enter judgment on the claims in this adversary proceeding."[73] The Defendants then admitted this allegation in

---

[69] *Stern*, 131 S. Ct. at 2606-07.

[70] *See* § 1334(a).

[71] *See* § 1334(b).

[72] § 157(a).

[73] Docket No. 77, at p. 2, ¶ 8.

their Answer to the Second Amended Complaint.[74] Furthermore, the Defendants concede the "First Claim for Relief is clearly a core claim that could be heard and decided by this Court but for the lack of constitutional authority raised in *Stern*."[75] As a result, this Court has the statutory authority to address the claims raised and there is no basis to now claim this Court lacks subject matter jurisdiction.

## CONCLUSION

Accordingly, based on the foregoing,

IT IS HEREBY ORDERED the relief sought in the Motion for Court Evaluation of Applicability of *Stern v. Marshall*, 131 S.Ct. 2594 (2011) (Docket No. 117) is DENIED. The parties shall be prepared to proceed with trial in this matter as previously scheduled by order of this Court, so this Court may hear and render a final decision in this proceeding.

Dated: July 30, 2012.　　　　　　　　BY THE COURT:

　　　　　　　　　　　　　　　　　　Michael E. Romero
　　　　　　　　　　　　　　　　　　U.S. Bankruptcy Judge

---

[74] Docket No. 90, at p. 3, ¶ 8.

[75] Docket No. 117, at p. 5, ¶ 19.